This case is about confidential information that was supposedly taken from Hallmark by a consultant and given to my client, Clipper. But Hallmark has already recovered for that injury. Under Missouri law, a plaintiff can't recover in contract from a party who took and disclosed information, and then recover again in tort from the party to whom the information was disclosed. That's what K-4 says, and it's exactly what happened here. We're talking about the discloser and the recipient of the same information, two sides of the same coin. And those two sides produce a single, indivisible injury. Once the plaintiff has elected to accept a recovery in tort for that injury, I'm sorry, a recovery in contract for that injury, K-4 doesn't allow a second recovery in tort. What about recovery for the use of the information? Well, the first case, the arbitration, was always about the information, the same information we're talking about here, and the conveyance of that information from Monitor to Clipper. We know that beginning with the letters that preceded the first arbitration. And then, of course, in the reopened arbitration, the allegations were exactly the same as the allegations in our case. So from the monitor was that Monitor had the information because of its work for Hallmark, and then it gave it to Clipper for use in respect to the RPG transaction. Well, maybe I've misunderstood, but I thought that the recovery, the award against Clipper was not necessarily for its receipt of the trade secrets or the confidential information, but for the use that it made of it, which at least at first glance on surface would appear to be a separate category of damage or injury from the simple breach of the agreement not to disclose or the receipt of the confidential information. Well, first of all, to am I going down the wrong trail here? Yes, with respect you are, for a couple of reasons. First of all, in the arbitration, again, the argument was always that Clipper was given the information for use. Now, it so happened that in the arbitration, at least in the initial arbitration award, there was no evidence that Hallmark suffered any competitive injury. But there isn't any evidence of competitive injury in our case either. That's why the injury in both the trial that is on appeal here and the arbitrations focused on the value of the lost trade secrets. So again, there was no competitive harm to Hallmark in either case. That is why the damage that was awarded both in this case and in the arbitration is compensation for the value to Hallmark of the trade secrets that it lost. Also, if you take a look back to the beginning of that arbitration, the theory, again, was always that Monitor was helping Clipper and helping it to use the information in the RPG transaction. We know that from the arbitration complaint. We know that from the letter that preceded the arbitration where Hallmark first raised an objection about Clipper's role in the RPG transaction. We know that from the extensive findings by the arbitrator about the relationship between Monitor and Clipper and about how information Clipper had a role and had an interest in using that information in the RPG transaction. Most importantly, when the arbitration was reopened, the allegations that were put before the court and then the arbitrator were exactly the same as the allegations that were put to the jury in our case. We're talking about the same five PowerPoint presentations that represent the trade secrets. In both cases, Hallmark tried very hard to blur the distinction between Monitor and Clipper, which are separate entities. It explained that they were, it took the position that they were a single enterprise. It took the position that Monitor was working with Clipper and providing services for its use in the RPG transaction. So that was always the only claim of harm that Hallmark had. Now, as it turned out, again, Hallmark has always been unable to prove any competitive harm. But that doesn't mean that the injuries in the two lawsuits were different. The damages, as I said, were coextensive too. And K-Force buttressed its conclusion about the injury being the same by looking at the damages and the way the damages were structured. Here, the arbitrator awarded the value of the lost trade secrets based on their cost of development. He looked at things like how much Monitor was paid for its role in developing the information and also how much Hallmark internally expended in preparing the information and developing it. The jury here was asked to look at the same things. The jury here was asked to determine a reasonable royalty that represented the value to Hallmark of the trade secrets. It was also asked to look at the cost of creation. And it framed that as an unjust enrichment award, but the elements of that unjust enrichment were the cost that Clipper was able to avoid because it didn't have to pay Monitor for this information. And also it was able to incorporate the internal development costs. So again, in both cases, the award was structured to include the amount that Monitor was paid for its work. Again, it's hard to imagine two cases where it's clearer that the injury was the same. In fact, we think the unity of the injury is even clearer here than it was in K-Force. And that's for three reasons. First of all, this case is before the court on a full trial record, whereas in K-Force it was a 12B6 motion. So here we know for sure that there's no other injury. There wasn't, for example, some separate competitive harm that was measured and quantified in this case. Secondly, as I said, in both cases Let me just ask this for clarification. Wasn't there evidence that Clipper used the trade secret information to develop its business specifically, or for example, the acquisition of RPG, which is a competitor of Hallmark? Wouldn't that be a category of harm or of injury that's different from simply the breach of the confidentiality agreement? Well, it's no different than the two were in K-Force. There too, you had the first lawsuit was a contract lawsuit against the party who breached the contract and got the information. In the second lawsuit, you have a lawsuit in tort against the party that received the information. In both, the theory was that the information was taken to put to use in the ultimate transaction. There it was the employee who took the information obviously had no use for it himself. The argument in K-Force was that he gave the information to his new employer, and it was the new employer that was going to put it to use. But the theory in both cases was that the reason he took the information was to give it to his employer to use. The use was part of both cases, and the same is true here. Again, that may have been the theory in both cases, but there was no proof of competitive harm. So if you look too at what the damages were intended to measure in both cases, it was the value of the lost trade secret. So Hallmark has been paid for that value twice. If you think about it, if you affirm this judgment, you'll be allowing Hallmark to recover $48 million dollars, which is more than four times what it paid Hallmark to develop this, or what it paid Monitor to develop this information and keep it still has the benefit of all the work Monitor performed. It still owns the secrets. It still thinks they're valuable. The secrets aren't currently in the hands of anyone who can use them competitively to Hallmark's disadvantage. Hallmark has never been able to prove any competitive harm, and to allow it to keep $48 million dollars in that circumstance is an outrageous windfall, which is the basis for our appeal. If I could turn briefly to the offset point. Now, we think that K-Force trumps the offset statute. Obviously, when this court decided K-Force, the offset statute was on the books, and that was not a barrier to the application of this very basic rule of Missouri law that calls for a clear consequence when a plaintiff chooses to take its recovery in contract. The offset statute applies when two parties are joint tortfeasors, and it sets a background principle. It holds that when one joint tortfeasor settles, the other joint feasor gets the benefit of the amount of that settlement, not based on how the parties characterize it, but based on the consideration that was actually paid. Now, Hallmark's argument here is that the settlement was all about contract, because that's how Hallmark and Monitor chose to characterize the settlement in the settlement agreement. But the point of this statute is to provide a background rule that protects parties who aren't in the room when a settlement is being negotiated. Now, here, there's no dispute that the settlement between Monitor and Hallmark released Monitor from liability for tort claims. You can find that at pages 293 and 294 of the appendix, of our appendix. And when there's a release for tort claims, you don't look behind the amount of the settlement. You simply apply the amount of the settlement, the amount of consideration actually paid as an offset to any other judgment against a joint tortfeasor. Hallmark also can't avoid this offset by claiming that the torts weren't joint. Its theory from the beginning, again, in both the arbitration and in this lawsuit, is that Monitor and Clipper were a joint enterprise. In fact, if you look at the first amended complaint, in this case, there's a civil regal claim, there's a characterization of Monitor and Clipper as a joint enterprise in performing tortious conduct. So it's really very clear that Hallmark's own theory was that these two were joint tortfeasors. Now, the district court here refused to apply the offset statute on waiver grounds, and we submit that that was error, no matter what the standard of review is. This court has held very clearly that technical noncompliance with Rule 8c isn't a basis for filing an affirmative defense waived unless there's unfair surprise to the plaintiff. And Hallmark still, to this day, has not been able to point to any unfair surprise, nor did the district court. And that's because everyone knew from the beginning of this lawsuit that this settlement was going to be an issue. That was known from the very beginning. In fact, it may be why the settlement was characterized the way it was, in an effort to avoid the offset statute. My client always contended that the judgment in this case would have to take the settlement into account, but the district court held before trial that the injury was not the same. That was in our motion based on KFORCE. That was in July 2012, and that was on summary judgment. But having resolved that issue, that the injury wasn't the same, it wasn't any surprise when less than a month later, the district court also held that the offset statute wouldn't apply. So there's no surprise here. Both sides knew that this was going to be an issue, and Hallmark has never pointed to any evidence that it would have presented at trial on any relevant issue to inform the application of this offset. That's because there is no jury issue on the application of the offset statute. Application of 537060 is a legal issue for the court. There's no need to present a jury instruction. As long as the settlement releases a tort claim, the offset applies for the entire amount. You don't look behind it. There's no allocation among different theories. There's nothing like that. You simply apply the statute as a matter of law, and Hallmark has not cited any cases that hold to the contrary. If I could turn very quickly to our punitive damages argument. We've also argued that no matter what happens to the punitive damages award itself should be set aside as a violation of due process because there was no possible basis here to find the reprehensibility required under State Farm. The district court made a critical mistake on this issue. He agreed that the conduct here was less reprehensible than in most cases, but it allowed punitive damages anyway because the multiplier was so low. But that's wrong. Punitive damages requires both a proper multiplier. If you look at State Farm versus Campbell, there are five factors to determine reprehensibility. None of them apply here. First of all, was the harm physical and not just economic? No. The harm was just economic. Second, did the tort show indifference to the health and safety of others? Obviously no. Third, was the target of the conduct financially vulnerable? Obviously no. Hallmark is large and very successful. Fourth, was the conduct repeated or an isolated incident? Here it was just this one incident. There's never been another allegation like this. And fifth, was the harm the result of malice, trickery, or deceit? That's the only one that Hallmark's ever pointed to, and we submit the evidence here does not support it. But even if it did, even accepting Hallmark's argument on that point, a punitive damages award cannot be allowed to stand based solely on that fifth factor when none of the other factors for reprehensibility are present. Now, we have other arguments, including our request for judgment as a matter of law based on the idea that these trade secrets were stale. If the Court has questions on that, I can answer them. Otherwise, I will reserve the rest of my time for rebuttal. Very well. You may do so. Thank you. Good morning. Mr. Is it pronounced Eisenbrae? Eisenbrae, Your Honor. Thank you, Your Honor. May it please the Court. But for the happenstance of an arbitration clause in Monitor's contract with Hallmark, this entire case would have been played out in the District Court. Hallmark sued Monitor. Later, they learned about the evidence of the passing of the information. They would have then sued, as they did, Monitor Clipper. The case would have continued to proceed, and along the way, Hallmark settled with Monitor.  When one co-defendant settles, that terminates the case against the other co-defendants. The case proceeds on. K-Force, the evil of K-Force was double recovery. And it's a very unique set of circumstances. The Court will recall in K-Force, a man named Alpert left his employment at K-Force and opened the office of Surex, the defendant, in St. Louis. Everything that Alpert did that injured K-Force, he did as an employee of Surex. Everything that Surex did that injured K-Force was done by the employee, Alpert. And that's why the Court mentions that those injuries line up. They're co-extensive. Nothing different. And in addition, K-Force took a judgment against Alpert. And a judgment has legal consequences. All of the damages that come from that co-extensive injury merge in that judgment. Here, a different situation applies. Hallmark contracted with Monitor in 2001. Later they learned that in 2002, 2003, 2004, and 2005, Monitor was breaching the confidentiality clause for which Hallmark paid $12.5 million and as the arbitrator found, that was the single most important aspect of the contract. Klipper had nothing to do with all those violations. Then in 2005, when Klipper received the information that's the only overlap here, the only overlap is that one little thing Klipper goes on, they use the information to price and negotiate the purchase of Hallmark's competitor, RPG. They use the information, and it's cited in our brief at pages 7, 8, 9, and 10. They use the information to obtain funding. They use the information to manage Klipper for the next three years. And Monitor has nothing to do with that. These are not co-extensive injuries by any stretch of the imagination. And K-Force simply has nothing to do with it. There's no judgment in the first case, and there's no co-extensive injuries. If you read the K-Force opinion, it's a very unique case. It doesn't come up very often. Three times the court refers to full recovery. A settlement by its terms is not a full recovery. The evil of K-Force is double recovery. Hallmark did not recover everything that it was entitled to when it settled with Monitor. So K-Force really has nothing to do with this case. This case is about 537.060. Now in 537.060, joint tort feasors who combine to create a single injury get credit when one of them settles. Again, though, it has to be a single injury. And in fact, the Missouri procedure that deals with 537.060 deals with that very point. When one co-defendant settles, and there are injuries that are different from the other co-defendants, some the same maybe and some different, a fact issue is presented. What was the payment for? Missouri approved instructions even have an instruction to deal with that very point. The Moore case in the Court of Appeals in Missouri and the Gibson case in the Court of Appeals in Missouri both expressly talk about the fact that when there is a dispute about the settlement, what it was for, that's a where the prejudice to Hallmark comes in because Clipper did not raise 537.060 and ask the District Court to instruct the jury on that point. They bring that statute up for the first time after trial. The prejudice to Hallmark is, at that point, they can't put on any evidence. Judge Smith can't say, this is what it's about. It's only about, they say it's all about tort. Hallmark would say that it's all about contract. Was there any motion along those lines that was denied? Any motion to do that? I don't know of any motion prior to trial where they specifically asked for 537.060 apportionment. In fact, in their summary judgment briefing, they expressly eschewed it. In a footnote in their summary judgment briefing, they said, we're arguing K-4's, we're not arguing 537.060. They never came back to the District Court and said, we know you think it's not the single injury, we do, and here's an instruction. They could have submitted the instruction, they could have argued it, and then the District Court might have had a chance to think about it and do it different. Had Hallmark known that they were going to make this argument after trial, Hallmark would have put on different evidence. Hallmark's general counsel, who did testify in any case, would have explained that when the settlement happened with Monitor, Monitor was financially stressed. That's in the record. Clippers Appendix 112-113. Monitor was running out of money. They came to Hallmark, and if you read that settlement agreement, it pays out money over a period of time of extensively past a year. In fact, as you'll see in the separate appendix, they came back to Hallmark and needed an extension. They couldn't pay it. That's one evidence that there's no full recovery, but it was about all of their breaches of contract. Hallmark would have been able to explain to the jury, these guys have been sharing our materials within Monitor and with some of their clients for four plus years. And Clipper had nothing to do with that, so they should not get a credit  and they want $16 million in credit. The 4.1 that the arbitrator initially awarded could not have had anything to do with misappropriation of trade secrets because he didn't know about it. Monitor had improperly withheld that information. Ms. Coverley didn't argue on the trade secrets point, and I'll submit on that. I think, really, their argument there is that these were stale and they were public information. They argued that extensively to the District Court and to the jury. The jury rejected that, and I think that there's no reason to disturb that decision. On the question of punitive damages, there are two issues. Properly instructed jury, there's no objection about that. There's no objection about the evidence. Came back with a verdict of .47 percent, less than one to one. Now, Clipper says yeah, at page 60 in their brief, they say yeah, but they based that on a compensatory award that was stale and supposedly used, and Ms. Coverley said it again this morning, supposedly used. Unprofitable to Clipper and no A, the jury found it wasn't stale. B, as we just detail in our brief, 7, 8, 9, and 10, it wasn't supposedly used. It was used. The jury was instructed, and they found that it was used, and there was plenty of evidence of use. Whether it was profitable or unprofitable to the misappropriator surely cannot be their test of whether or not they should have a punitive award against them, because first of all, in this case, we don't know how much Clipper actually made. They got a substantial fee for the transaction. You heard a lot this morning and in the briefs that there's no harm to Hallmark. I disagree with that, and I'll tell you why. First of all, Clipper purchased RPG, Recycled Paper Greetings. It was, at the time, the third largest competitor in the greeting card world. They managed it for three years until the late 2008 and 2009. It was over-leveraged, and American Greetings took it through a prepackaged bankruptcy. RPG is not defunct, as Clipper says today. You can go out and buy an RPG card today. Hallmark doesn't know, and it's difficult to say what's the damage when you're dealing with a consumer product like this. You can't go out and interview people and say, did you buy a Hallmark card or an RPG card for this reason or that reason. That's why the law allows for a reasonable royalty, and Hallmark put on its evidence of a reasonable royalty. RPG attacked that, and the jury made the decision that they made. Now, a reasonable royalty is not the same as cost of creation. A lot of the argument that Hallmark made whole here is because the cost of creation was $12.5 million. $12.5 million is what we paid Monitor to work with our people for more than a year to develop something. No one would pay $100 to create something that's worth $100. There's no profit in that. If you want a good example of what's the value of cost of creation, it's an urban legend that Coca-Cola's formula is a trade secret. I'm sure that it didn't cost Coca-Cola as much money as that formula has benefited them over the last 100 years. You use the trade secret, you might be able to create it for, who knows what it would cost you to create, but you use it for your profit long after that. Hallmark's information that was contained in these documents, and it's in art, the fourth appendix is a color version of it. They say it's all public and all stale. You can flip through it and see. Included in there is a slide that lays out the difference in cost to Hallmark to service Gold Crown stores, mass channels like grocery stores, and Walmart. That's highly, highly secret information. They passed that on to Flipper. Flipper passed that on and had used it, and he had that advantage. Hallmark doesn't know and can't say we lost this account because of that, but they do know that their then third largest competitor, now a division of their major competitor, is in fact exposed to that for more than three years. I think that's sufficient for harm. Now, the question of reprehensibility. There are five factors that the Supreme Court mentioned. If you think about it, in your average run-of-the-mill tort, like a misappropriation of trade secrets or a patent case, the first three are almost unusually not going to apply. They're almost never going to have physical harm. Not ever, but not very often are they going to have health and safety issues. Vulnerable victims, occasionally you might find one, but frequently these are corporations dealing with one another. As the Fifth Circuit said in the Wilogics case, the Supreme Court has never really explained what it means to be a vulnerable victim. Obviously in the State Farm case, that was a particular fact in the case. Here you have a corporation. If somebody goes out and steals the trade secrets of a corporation, almost always the first three are not going to count. You're down to repeated conduct and malice. If you have to have both repeated conduct and malice, it really means that you get a free shot the first time you do it. Malice is enough, and there's plenty of malice here. In this case, well, before I get to that, in the Wilogics case, and in the cases following Chicago Title, which Clipper follows, in the Sixth Circuit even, the courts have said when you only have malice, that means your ratio is not allowed to be so high. The Chicago Title ratio was 3 to 1. Several cases citing that have approved when it's 1 to 1 or less than 1 to 1, which is what we have here. But what's the malice? Clipper was told when they first got interested in RPG, they were told by Steve Levin, a monitor employee, when they asked, I don't have anything that's not Hallmark specific, that's not confidential. They didn't quit. They kept coming back to Mr. Levin. In fact, as the record shows, they incentivized the people. Levin carried interest of more than $260,000 for his assistance. After they got it, and by the way, the information was being relayed and discussed with the managing director, Young, of Clipper. This is not something low-level people were doing. When they were confronted with it, they denied it. Now, Clipper says in their brief, well, yeah, all defendants deny things. Well, that's true. They do. But this wasn't in a lawsuit that they denied it. They denied it when they were asked by Hallmark, do you have any of our stuff? No, we don't. Why would they say that? Because they could continue to use it. They denied it in early 2006. Their 30B6 witness, who actually received the information, Mr. Doctoroff, denied it and lied about it under oath in a deposition in August of 2006. They continued to do these things to keep it and be able to use it, which they had for several years. When the evidence was destroyed, we have evidence that Mr. Maxwell, one of the Clipper people, was advised in advance his computer was going to be imaged. He ran a program called Shredder. The testimony in the record is that when you run Shredder, nobody knows what it was that was in there. And then finally, they come to Hallmark when Hallmark has learned about the fact that they got some of this, and they said, don't bring a lawsuit. We will make a confidential agreement with you and have a third party check our systems to see if we have any of your stuff. Knowing when they made that agreement, that they had allowed Mr. Brown, Mr. Palker, Mr. Kim's computers to be erased, and finally knowing that they had, in fact, received the information. So, I think that the outrageous conduct and the malice that the jury, they heard all this evidence. There was plenty of evidence for the jury to find malice, and in a situation where the recovery is less than one to one, there's no case that we have found, and none that Clipper cites, and the Fifth Circuit said the same thing in the Wlodzik's case. Nobody's found a case where less than a one to one punitive verdict where there was malice found has been vacated or reversed. Clipper misappropriated the trade secrets of Hallmark. They used them. They used them for years. They lied about it. They come in here and tell you that Hallmark's getting a windfall. The windfall here would be Clipper, because they would get out of here not ever having to pay a thin dime for the use that they made of those trade secrets. And if you have any questions, otherwise, thank you for your time. Turning back to K-Force, it's not just about double recovery. If it were, it would just have applied the offset statute. It's about something else. It's about the election of remedies doctrine, which still remains in force to this day in Missouri. That's a doctrine that may have received some criticism over the years, but it is very clear in the case law of Missouri that the election of remedies doctrine remains in force and that the Supreme Court of Missouri has never seen fit to revisit it. So with that in mind, K-Force is not just about double recovery, but also about election of remedies and avoiding serial litigation. Now, my colleague referred to full recovery. Well, full recovery can't mean enough money that the argument seems to be that Hallmark can sue and sue and sue until it's content with its recovery. That's exactly the opposite of what K-Force does. I suppose the counter to that would be that your client can lie and lie and lie. The question here is, under K-Force, what is the separate injury? And there has been no identification of any separate injury because under K-Force, the receipt and the disclosure and use of the same information are two It is not happenstance, by the way, that these claims proceeded separately. What K-Force tells us is that if a plaintiff is not going to be content with the contract remedy for its injury, then it's the plaintiff's responsibility to make sure the contract and tort claims proceed in tandem or to make sure the tort claims proceed to judgment first. Now here, Hallmark could have agreed to send all these claims to arbitration together. We actually moved to send our claims to arbitration alongside Monitor's claims and Hallmark opposed that motion. Hallmark could have agreed to it, in which case all these claims would have proceeded together and there wouldn't have been any contract limitation on the recovery. It could have asked that the contract claims be stayed pending resolution of the trial. We actually asked for the opposite. Hallmark made no such request. Also, if you take a look at the settlement here, it is not as if the settlement was less than the full amount of what was owed under the contract. The contract here would have allowed, at most, $12 million in damages, which was the total that Monitor was paid throughout its engagement. The settlement here was in total for $16 million against Monitor. There's no theory under which the recovery in the contract action was less than full when the amount Hallmark actually pocketed at the end of that action was greater than what the contract would have allowed under its own terms. Now, with respect to the offset statute, Hallmark's cases, the cases it cites, are all about whether the settlement actually involved more than one injury. None of them suggest that a jury should decide whether some portion of the settlement is actually attributable to a tort settlement as opposed to a contract settlement. And none of them say anything about sending those allocation questions to the jury. The Moore case, which my colleague cited, doesn't require the jury to allocate a settlement between tort and contract. It was about whether the jury was the same between the two suits. And the Missouri cases that we've cited, including there's a new Payne case that was issued shortly before our reply, they hold that when the issues of whether there was a settlement, whether a payment was made, and whether the payment related to the settlement, when those issues aren't disputed, there is nothing for the jury to decide at all. And that's why there was no prejudice here. On the issue of the trade secret claim, I'll just My colleague pointed to certain slides within the presentations that he said remained confidential. Of course, the trade secret theory in this case was not that individual slides were trade secrets. It was that the compilations as a whole represented business strategies. So we've taken that theory to heart. And we've pointed to all the places where those business strategies were disclosed, which is why they were stale and already disclosed. On the harm point Thank you very much. The case is submitted and we will go on to the second case of the morning.